IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MARY L. WOODS, | ) | Case No. 3:18-cv-1070 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Mary Woods, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XIV of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the administrative law judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Woods' application for DIB and SSI be affirmed.

## II.      Procedural History

On January 12, 2015, Woods protectively applied for DIB and SSI.  (Tr. 15, 167–79).[1] Woods alleged that she became disabled on December 19, 2014, due to congestive heart failure, high blood pressure, and diabetes.  (Tr. 56, 65, 76, 85, 167, 174).  The Social Security

---

[1] The administrative transcript is in ECF Doc. 12.

Administration denied Woods' applications initially and upon reconsideration.  (Tr. 56–95).

Woods requested an administrative hearing.  (Tr. 113–14).  Administrative Law Judge ("ALJ")

Terry Michael Banks heard Woods' case on April 13, 2017, and denied the claim in a June 29,

2017, decision.  (Tr. 15–23, 29–52).  On March 10, 2018, the Appeals Council denied further

review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1–6).  On May

9, 2018, Woods filed a complaint to seek judicial review of the commissioner's decision.  ECF

Doc. 1.

### III.    Evidence

#### A.    Personal, Educational and Vocational Evidence

Woods was born on April 18, 1954, and she was 60 years old when she filed her

applications.  (Tr. 167, 174).  Woods completed high school and one year of college.  (Tr. 33,

37).  Woods had prior work experience as a cashier.  (Tr. 38–39, 195).

#### B.    Relevant Medical Evidence

On February 27, 2014, Woods saw Pamela Gardner, DO, for ongoing shortness of breath.

(Tr. 312).  Chest x-rays showed congestive heart failure.  (Tr. 312).  On examination, Woods was

alert and cooperative, had a regular heart rate, and had edema in her legs.  (Tr. 312).  Dr. Gardner

prescribed Woods medication to control her heart symptoms, and she was diuresed.  (Tr. 313).

Dr. Gardner also ordered pulmonary perfusion imaging, which revealed uniform perfusion and

ventilation throughout both of Woods' lungs and no abnormalities.  (Tr. 313, 326).  A stress test

revealed anterior lateral ischemia, and on March 3, 2014, Woods received a cardiac catheter.

(Tr. 304).  At a follow-up on April 2, 2014, Dr. Gardner noted that Woods felt much better, did

not have any pain or swelling at her catheter site, and did not have any shortness of breath,

lightheadedness, or dizziness.  (Tr. 299).  On April 15, 2014, Woods told Dr. Gardner that she

had shortness of breath again and that her legs were swelling.  (Tr. 309).  On examination,

Dr. Gardner noted that Woods had decreased breath sounds and edema in her legs but did not note any other problems.  (Tr. 310).

On April 26, 2014, a metabolic panel test indicated that Woods had high blood glucose, creatinine, and potassium.  (Tr. 441).

On May 6, 2014, Woods told Dr. Gardner that she did not take her medication or potassium due to a renal injury and hyperkalemia.  (Tr. 296).  Dr. Gardner did not note any significant changes in Woods' condition on examination.  (Tr. 297–98).  On September 5, 2014, Woods told Dr. Gardner that she no longer had shortness of breath.  (Tr. 292).

On December 2, 2014, Woods saw Glenn Bryant, III, MD, for a follow-up on her chronic kidney disease and cardiorenal syndrome.  (Tr. 339).  Dr. Bryant stated that Woods had a well-compensated disease, and she was doing well overall.  (Tr. 339).  On examination, Dr. Bryant noted that Woods had swelling in her legs and shortness of breath upon exertion; however, he did not note any other problems with her physical or mental condition.  (Tr. 340). He prescribed aspirin and other medications for Woods' cardiorenal syndrome and recommended that Woods take vitamin supplements for her other conditions.  (Tr. 340–41).

On December 13, 2014, Woods went to the emergency center at Lima Memorial Health System because she had difficulty breathing.  (Tr. 259).  Stephanie Casey, MD, noted that Woods had a history of heart failure, but she was not ill until earlier that day.  (Tr. 259).  Woods reported that she had diabetes and hypertension but had not taken insulin or blood pressure medications for several years due to cost.  (Tr. 259).  A chest x-ray revealed central vascular congestion and mild cardiomegaly.  (Tr. 281).  On December 14, 2014, Woods had a chest x-ray, which showed that her pulmonary edema had improved, there was mild cardiac enlargement, and there were small bilateral pleural effusions suspected.  (Tr. 279).  Dr. Bryant noted that Woods was transferred out of the heart and vascular unit, she had good urine output after she was given

Lasix, her potassium needed to be kept greater than 4, her magnesium needed to be greater than 2, and her renal condition would be closely monitored.  (Tr. 353).  On December 15, 2014, Woods had a renal ultrasound, which revealed "mild renal atrophy" in both her right and left kidneys.  (Tr. 277).  Woods was discharged on December 17, 2014.  (Tr. 358).  The discharge notes indicate that Woods' renal function had begun to rebound, her congestive heart failure symptoms were completely resolved with no residual shortness of breath, and she had no residual leg edema.  (Tr. 358).  Brenda Drummond, CNP, directed Woods to manage her weight and dietary salt intake closely.  (Tr. 358).

On December 14, 2014, Woods saw Mehran Arabpour, DO, for a consultation regarding her chronic systolic heart failure.  (Tr. 306).  Dr. Arabpour noted that Woods had good urine output and felt better after taking medications.  (Tr. 306).  Dr. Arabpour also noted that Woods was diagnosed with chronic systolic heart failure, chronic kidney disease stage III, hypertension, diabetes mellitus, and nonobstructive coronary artery disease post catheterization.  (Tr. 306).  On examination, Dr. Arabpour noted that Woods had full strength in her upper and lower extremities.  (Tr. 307).

On December 29, 2014, Woods saw Vernon Watty, MD, to establish primary care.  (Tr. 336).  Woods told Dr. Watty that she felt well and denied any chest pain or lower extremity swelling.  (Tr. 336).  On examination, Dr. Watty noted that Woods appeared well developed and well nourished, had normal lung and heart sounds, and did not have any swelling.  (Tr. 336).  Dr. Watty continued Woods' medications for her congestive heart failure and encouraged Woods to follow up with a nephrologist and cardiologist regarding her hypertension.  (Tr. 337).

On January 7, 2015, Woods saw Dr. Bryant for a follow-up regarding her December 2014 hospitalization.  (Tr. 332).  Dr. Bryant noted that Woods was diuresed while she was in the hospital, and that diuresis helped "a great deal."  (Tr. 332).  Woods reported that she felt much

4

better, and she did not have a diuretic resistance.  (Tr. 332).  A metabolic panel indicated that Woods had high creatinine, potassium, glucose, and blood urea nitrogen.  (Tr. 333).  On examination, Dr. Bryant noted that woods had a normal gait and normal strength.  (Tr. 334).

On January 15, 2015, Woods went to St. Rita's Hospital because she had "sharp pains" when she used the restroom and felt nauseous.  (Tr. 369).  Gary Poturalski, MD, noted that Woods had diabetes and a history of renal problems.  (Tr. 370).  Dr. Poturalski did not note any abnormalities on physical examination; and noted that Woods had a normal range of motion, was oriented, and appeared well-developed.  (Tr. 371–72).  Woods did not permit Poturalski to do a full anal examination to investigate her pain.  (Tr. 372).

On January 16, 2015, Woods told Kamal Yoakim, MD, that she felt "a lot better" after she was treated for her sharp pain and nausea.  (Tr. 383).  On examination, Dr. Yoakim noted that Woods was alert and cooperative, and she had normal extremities and intact movement. (Tr. 379).  Dr. Yoakim determined that Woods had lower abdomen pain and a possible UTI, and he noted that Woods chronic kidney disease had shown "some improvement" with medication. (Tr. 381).  Norman Moser, MD, noted that Woods did not have any pain within the 24 hours she was at the hospital, and that she asked to go home.  (Tr. 383).  On examination, Dr. Moser noted that woods heart condition was normal, her extremities were normal, she had a strong grip, her leg strength was strong, and she did not have any pain or nausea.  (Tr. 384).  Dr. Moser stated that Woods chronic kidney disease was related to her diabetes and hypertension, and that it was stable.  (Tr. 384).  Dr. Moser recommended that Woods avoid certain pain relievers, hydrate, and monitor her kidney function tests.  (Tr. 384).

On January 23, 2015, Woods told Dr. Gardner that she did not have any pain, shortness of breath, edema, fatigue, headaches, or other symptoms.  (Tr. 288).  Dr. Gardner continued Woods' heart, hypertension, hyperlipidemia, and diabetes medications.  (Tr. 290).  Dr. Gardner

also recommended that Woods maintain a heart healthy diet and exercise.  (Tr. 290).  At a follow-ups on April 10 and 19, 2015, Woods said she had mild swelling in her ankles and, but continued to deny any pain, dizziness, shortness of breath, and fatigue.  (Tr. 421, 518).  On October 12, 2015, Dr. Gardner noted that Woods' breathing and weight were stable, but she had chills and nausea.  (Tr. 514).  Dr. Gardner continued Woods' prescriptions, recommended that she see another doctor for her nausea and vomiting, and recommended that she maintain a heart healthy diet and exercise.  (Tr. 517).

On February 2, 2015, Woods saw Dr. Bryant for treatment of her chronic kidney disease and cardiorenal syndrome.  (Tr. 329).  Dr. Bryant noted that Woods was "doing well," and that he was going to place her back on a diuretic.  (Tr. 329).  He noted that Woods was recently in the hospital over diuresis, but felt better and had no headaches, abdominal pain, chest pain, visual changes, or shortness of breath.  (Tr. 329).  At follow-ups on July 15, 2015, and January 20, 2016, Dr. Bryant noted that Woods was doing well, and she had very little edema, no pain, and no shortness of breath.  (Tr. 509–10, 512–13).  On February 18, 2016 and April 18, 2016, Dr. Bryant noted that Woods had trouble maintaining stable potassium and tolerating her therapy.  (Tr. 503, 506).  On examination, Dr. Bryant noted that her heart, lungs, gait, and strength were normal.  (Tr. 503–04, 507).  Dr. Bryant adjusted Woods' medications, recommended a low potassium diet, and recommended that she keep following her condition with the renal clinic.  (Tr. 504, 507).  On February 22, 2017, Dr. Bryant noted that Woods "appear[ed] to be very angry with [her treatment providers and was] 'fed up with all this medication.'"  (Tr. 545).  Dr. Bryant noted that Woods had acidosis, hyperkalemia, and advanced chronic kidney disease.  (Tr. 545).  He noted that Woods was on vitamin D replacement therapy and that her anemia was being followed in the renal clinic.  (Tr. 545).  He recommended avoiding an RAAS blockade, continuing her diuretic medication, maintaining a low potassium diet, starting a sodium

bicarbonate therapy, and adjusting her vitamin D metabolites.  (Tr. 545).  On examination, Dr. Bryant noted that Woods was well-developed, alert, and oriented, and that she had normal chest, lungs, gait, strength, and movement.  (Tr. 547).

### C.    Relevant Opinion Evidence

#### 1.    Treating Physician-Glenn Bryant, III, MD

On an unspecified date, Dr. Bryant completed a questionnaire, stating that Woods could not perform sedentary, light, or medium work.  (Tr. 549).  Dr. Bryant did not include any explanations for his conclusions, and he did not answer questions on the form regarding any projected absences or how long Woods' condition had existed.  (Tr. 549).  He also did not list any specific functional limitations.  (Tr. 549).

#### 2.    State Agency Consultants

On March 27, 2015, state agency consultant James Cacchillo, DO, assessed Woods' functional limitations based on a review of her medical records.  (Tr. 59–62).  Dr. Cacchillo determined that Woods had the severe impairments of chronic heart failure and diabetes mellitus. (Tr. 59).  Dr. Cacchillo stated that Woods could lift to 20 pounds occasionally and 10 pounds frequently, stand and/or walk for up to 6 hours in an 8-hour workday, and sit for up to 6 hours in an 8-hour workday.  (Tr. 60–61).  Woods could never climb ladders, ropes, or scaffolds, and had to avoid concentrated exposure to extreme temperatures, humidity, and fumes, odors, dusts, gasses, and poor ventilation.  (Tr. 61–62).  Woods could frequently climb ramps and stairs, and she could occasionally crawl.  (Tr. 61).  She had no other functional limitations.  (Tr. 61–62). On July 10, 2015, Dianne Manos, MD, concurred with Dr. Cacchillo's opinion, except that Dr. Manos found that Woods could only occasionally climb ramps and stairs, needed to avoid concentrated exposure to hazards such as machinery, and was unlimited in her ability to crawl. (Tr. 81–83).

### D.     Relevant Testimonial Evidence

Woods testified at the ALJ hearing. (Tr. 34–47). Woods testified that she lived by herself on one side of a house, and her son lived on the other side of the house. (Tr. 35–36). She received a $396.69 pension check each month, as well as $194 in food stamps. (Tr. 36). She never had a driver's license, and she used the bus or got rides from her son to get around town. (Tr. 37). In a typical day, Woods slept until 2:00 pm; however, she said that she had recently started to wake up at her normal time of 6:00 am. (Tr. 44). She took a late morning nap and went back to bed at 8:00 pm. (Tr. 44). Woods grocery shopped, cooked her own meals. (Tr. 46).

Woods stated that she last worked as a cashier in December 2014. (Tr. 38–39). She did not have to do any lifting as a cashier, and at most had to "slide" a 10-pound bag of potatoes. (Tr. 39). She said that she left work when she got sick in December 2014 and returned to work in March 2015. (Tr. 38, 41). Woods did not remember anything about her sickness in December 2014, except that she ended up in the hospital for congestive heart failure. (Tr. 41). After she returned to work, she passed out in her car after she went to McDonald's. (Tr. 41–42). She did not return to work, because she did not "have the energy" and got tired. (Tr. 42).

Woods stated that she first learned she had kidney problems during her March 2015 hospitalization. (Tr. 43). She said that she went to the renal clinic every month to check her potassium levels. (Tr. 43). Woods said that she had some pain and leg swelling, but that her legs were no longer swelling, and she felt a lot better. (Tr. 44). With regard to her diabetes, Woods said that she had trouble controlling her blood sugar, got thirsty often, and occasionally felt like she was going to faint when her blood sugar was low. (Tr. 45–46). She also gained and lost weight. (Tr. 46). She changed her diet and took a sugar tablet to keep her blood sugar stable. (Tr. 45–46).

8

James Fuller, a vocational expert ("VE"), also testified at the hearing.  (Tr. 48–50).  The VE testified that Woods' prior work as a cashier was light work, as generally and actually performed.  (Tr. 49).  The ALJ asked the VE whether a hypothetical individual with Woods' RFC, age, and experience, could perform Wood's past work as a cashier, if she limited to light work, except that:

> She can occasionally climb ramps and stairs.  She can never climb ladders, ropes, or scaffolds.  She can occasionally kneel and crawl.  She must avoid concentrated exposure to extreme heat and cold, to humidity, and to pulmonary irritants.  She can never be exposed to unprotected heights, dangerous moving mechanical parts, operate a motor vehicle, work with hazardous equipment or be exposed to uneven terrain.

(Tr. 49–50).  The VE testified that such an individual would be able to perform Woods' past work as a cashier, as generally and actually performed.  (Tr. 50).

## IV.    The ALJ's Decision

The ALJ's June 29, 2017, decision found that Woods was not disabled and denied her applications for DIB and SSI.  (Tr. 15–23).  The ALJ found that Woods met the insured status requirements through December 31, 2019 and had not engaged in substantial gainful activity since December 19, 2014.  (Tr. 17).  The ALJ found that waters had the severe impairments of: congestive heart failure, diabetes mellitus, chronic kidney disease, and cardiorenal syndrome.  (Tr. 18) (stating that "[t]he above medically determinable impairments significantly limit the ability to perform basic work activities").  The ALJ determined that Woods had no impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18–19).

The ALJ determined that Woods had the RFC to perform light work, except that:

> She can occasionally climb ramps and stairs.  She can never climb ladders, ropes, or scaffolds.  She can occasionally kneel and crawl.  She must avoid concentrated exposure to extreme heat and cold, humidity, and pulmonary irritants.  Finally, she can never be exposed to unprotected heights, dangerous moving mechanical

parts, operate a motor vehicle, work with hazardous equipment, or be exposed to
uneven terrain.

(Tr. 19).  In assessing Woods' RFC, the ALJ explicitly stated that he "considered all symptoms"

in light of the medical and other evidence in the record.  (Tr. 19).  The ALJ stated that,

> while the claimant has medically determinable impairments that could reasonably
> cause some symptoms and limitations, her allegations are considerably broader
> and more restrictive than is established by the medical evidence. . . .  [T]he
> objective evidence does not demonstrate the existence of limitations of such
> severity as to have precluded the claimant from performing all work on a regular
> and continuing basis.  * * *  The claimant is limited to work at a light exertional
> level due to her congestive heart failure, chronic kidney disease, and cardiorenal
> syndrome.  Symptoms and complaints related to these conditions are also
> considered in limitations regarding climbing, postural movements, and exposure
> to workplace hazards.

(Tr. 22).

The ALJ gave "great weight" to Dr. Cacchillo's and Dr. Manos' opinions – that Woods

"could perform less than the full range of light work, with limitations on climbing, crawling,

exposure to temperature extremes, . . . exposure to humidity and pulmonary irritants . . . and

hazards, such as machinery and heights."  (Tr. 21–22).  The ALJ explained that Dr. Cacchillo

and Dr. Manos reviewed Woods' records, had program knowledge, and gave opinions that were

consistent with the evidence, including Woods' own testimony and statements to treatment

providers.  (Tr. 22).

The ALJ gave "little weight" to Dr. Bryant's opinion – that Woods could not perform

sedentary, light, or medium work.  (Tr. 22).  The ALJ explained that Dr. Bryant did not explain

his conclusion or provide an analysis of Woods' functional abilities.  (Tr. 22).  Further, the ALJ

explained that Dr. Bryant's opinion was inconsistent with the record as a whole, including his

own and other providers' treatment notes indicating that Woods was doing well without

complaints.  (Tr. 22).

10

Because the ALJ found that Woods was unable to perform all or substantially all of the requirements of light work, he relied on the VE's testimony to determine whether Woods could perform her past relevant work. (Tr. 22–23). Based on the VE's testimony that Woods' prior work as a cashier "could be performed within the confines of the above residual functional capacity," the ALJ found that Waters was able to perform her prior work as a cashier. (Tr. 22–23). In light of his findings, the ALJ determined that Woods was not disabled from December 19, 2014, through the date of his decision and denied Woods' applications for DIB and SSI. (Tr. 23).

## V.     Law & Analysis

### A.     Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court does not decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court would reach a different conclusion or evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially

supported in the record.").  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals

any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006).  The claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.  Severe Impairments, State Agency Consultants' Opinions, and Woods' RFC

### 1.  Parties' Arguments

Woods argues that the ALJ erred in reaching an RFC finding that was identical to the state agency consultant's RFC finding, because the ALJ found that Woods' stage four kidney disease and cardiorenal syndrome were severe impairments, whereas the state agency consultants did not.  ECF Doc. 13 at 5–8.  Woods contends that the ALJ was required to reconcile the conflict between his and the state agency consultants' severe impairment findings, because he gave the state agency consultants' opinion great weight in determining her RFC.  *Id.* at 7.  Woods asserts that, because the state agency consultants had access to records regarding Woods' kidney problems but did not mention those problems in their functional narrative, the ALJ's reliance upon the state agency consultants' opinions is "troubling."  *Id.* at 7–8.  Further, Woods argues that "there is no way of knowing if multiple severe impairments were considered when constructing the residual functional capacity [or] whether the residual functional capacity accurately portrayed Ms. Woods' physical impairments," because the ALJ did not resolve the inconsistencies between the state agency consultants' findings and the ALJ's finding that Woods had additional severe impairments.  *Id.* at 8.

The Commissioner responds that the ALJ properly considered the evidence in the record, including the medical opinion evidence, and reached a decision supported by substantial evidence in determining Woods' RFC. ECF Doc. 15 at 7–10.  Specifically, the Commissioner argues that the ALJ properly found that Woods' kidney disease and cardiorenal syndrome were severe impairments, considered whether her impairments met or medially equaled a listed impairment, and considered all of Woods' symptoms in determining her RFC. Id. at 7.  The Commissioner also contends that Woods has not shown that the state agency consultants failed to consider Woods' renal problems, and that the record shows that the state agency consultants explicitly referred to treatment notes from Woods' kidney doctors in assessing her functional limitations. Id. at 10.  Further, the Commissioner argues that the ALJ adequately considered and accommodated for Woods' symptoms in deciding her RFC, and that Woods has not alleged any additional functional limitations that the ALJ should have included in his RFC finding. Id. at 10. Finally, the Commissioner asserts that substantial evidence supported the ALJ's decision to give great weight to the state agency consultants' opinions and the ALJ's RFC finding. Id. at 7–10, 13–14.

Woods replies that the Commissioner failed to respond to her arguments, but instead "created her own legal issue and defended the ALJ's position against that issue." ECF Doc. 16 at 2.  Woods asserts that the issue she raised "centers around the confusion of the ALJ's decision to rely heavily on the opinions of the state agency physicians[,] even though they did not even consider Ms. Woods' chronic kidney disease or her cardiorenal syndrome." Id.  Woods contends that the ALJ "admitted that [her cardiorenal syndrome and kidney disease] significant[ly] limited [her] ability to do basic work" when he found that her cardiorenal syndrome and kidney disease were severe impairments; however, the ALJ's "residual functional capacity [analysis] reflects no such consideration for these severe and limiting impairments." Id.  Thus, she argues that "the

ALJ's complete lack of explanation" for not finding more functional limitations than the state agency consultants found resulted in a failure to provide a "logical bridge between the evidence on the record and his conclusion."  *Id.* at 2–3.

### 2.    RFC Determination Analysis

At Step Two of the sequential analysis, the ALJ considers whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c).  Step Two is a threshold inquiry "intended to 'screen out totally groundless claims.'"  *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).  The Sixth Circuit has applied a *de minimis* standard to the Step Two inquiry, meaning that the ALJ must find that a claimant's medically determinable impairment is severe, so long as it has more than a minimal effect and would be expected to interfere with the individual's ability to work.  *See Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) ("An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."); SSR 96-3p, 61 Fed. Reg. 34468, 34470 (Jul. 2, 1996) ("If the [ALJ] finds that [the claimant's] symptoms cause a limitation or restriction having more than a minimal effect on an individual's ability to do basic work activities, the [ALJ] must find that the impairment[] is severe and proceed to the next step in the process even if the objective medical evidence would not in itself establish that the impairment[] is severe.").  If the ALJ determines that the claimant does not have a severe impairment, or combination of impairments, the regulations direct the ALJ to find that the claimant is not disabled.  20 C.F.R. §§ 404.1520(c), 416.920(c).  However, "[a]fter an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'"  *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p,

61 Fed. Reg. 34474, 34477 (Jul. 2, 1996)). So long as the ALJ considers all the claimant's impairments – severe and non-severe – in the remaining steps of the disability determination, any error at Step Two is harmless. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an administrative assessment of a claimant's ability to do work despite her functional limitations. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 4, 1996)). "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairments or combination of impairments." SSR 96-8p, 61 Fed. Reg. at 34475. Nevertheless, the ALJ's Step Two severe impairment finding does not dictate the character, nature, and extent of functional limitations that the ALJ might find during the RFC analysis. *Cf. id.* (stating that "[m]edical impairments and symptoms . . . are not intrinsically exertional or nonexertional," and that the ALJ must determine the extent to which the claimant's impairments "*may* cause physical or mental restrictions that *may* affect his or her capacity to do work-related physical and mental activities." (emphasis added)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Id.* at 34477 (emphasis in original). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a).

The ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion.

16

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506–07 (unpublished) (noting that two or three visits "often will not suffice for an ongoing treatment relationship" required for a physician to be a treating source).  On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'"  *Gayheart*, 710 F.3d at 376.  Instead, the ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion.  *Id.*; 20 C.F.R. §§ 404.1527(c), 416.927(c).  Generally, an examining physician's opinion is due more weight than a nonexamining physician's opinion.  20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); *Gayheart*, 710 F.3d at 375.  The ALJ does not need to articulate good reasons for rejecting a nontreating or nonexamining opinion.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions).  The ALJ may rely on a state agency consultant's opinion and may give such an opinion greater weight than other nontreating physicians' opinions, if it is supported by the evidence.  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015).

"Even [when the] ALJ provides 'great weight' to an opinion, there is no requirement that [the] ALJ adopt [the opinion's] limitations wholesale."  *Id.* at 275.  So long as the ALJ's RFC determination considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC.  *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) (unpublished) ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to

credit, and which to reject.  Contrary to [the claimant's] contention, the ALJ had the authority to make these determinations.").  Nevertheless, if a medical source's opinion regarding the claimant's functional limitations conflicts with the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination.  *See Fleischer*, 774 F. Supp. 2d at 881.  The ALJ need not incorporate his explanation into a single, tidy paragraph, so long as his discussion as a whole is sufficiently specific enough for a subsequent reviewer to understand his reasons for crediting one opinion over another.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–89 ("There is no requirement of such tidy packaging, however; we read the ALJ's decision as a whole and with common sense."); *cf. Gayheart*, 710 F.3d at 376 (stating that an ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight.").

As a preliminary matter, Woods' argument – that the ALJ could not, without additional explanation, give great weight to the state agency consultants' opinions, because he found that Woods had more severe impairments than the state agency consultants found she had – conflates the Step Two severe impairment inquiry with the Step Four residual functional capacity inquiry.  *Compare* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c), *with* 20 C.F.R. §§ 404.1520(e), 416.920(e).  The ALJ's Step Two determination that Woods' congestive heart failure, diabetes mellitus, chronic kidney disease, and cardiorenal syndrome were severe impairments that limited her ability to perform basic work activities was merely a threshold determination.  *Nejat*, 359 F. App'x at 576; (Tr. 18).  Here, the ALJ was required to find that Woods' medically determinable impairments were severe, so long as they caused more than a minimal effect on her ability to work.  *Brady*, 724 F.2d at 920; SSR 96-3p, 61 Fed. Reg. at 34470.  The ALJ's determination that Woods had these severe impairments was not, in itself, a

determination regarding the character or extent of functional limitations that might have been caused by those impairments.  SSR 96-3p, 61 Fed. Reg. at 34470; SSR 96-8p, 61 Fed. Reg. at 34475.  Instead, the ALJ's finding that Woods had severe impairments, including chronic kidney disease and cardiorenal syndrome, required only that the ALJ proceed in the sequential evaluation process and consider *all* of Woods' impairments – severe or otherwise – in assessing her RFC.  *Nejat*, 359 F. App'x at 577; SSR 96-8p, 61 Fed. Reg. at 34477.

The ALJ applied proper legal procedures in weighing the state agency consultants' opinions.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.2d at 125.  The ALJ complied with the regulations by explicitly considering Dr. Cacchillo's and Dr. Mano's opinions in light of the evidence as a whole and stating that he gave "great weight" to their opinions.  *Gayheart*, 710 F.3d at 376; *Justice*, 515 F. App'x at 587; 20 C.F.R. §§ 404.1527(c), 416.927(c).  Furthermore, the ALJ was not required to explain the conflict between his RFC finding and the state agency consultants' opinions, because: (1) the ALJ's RFC finding – as Woods points out – recited the same functional limitations found in the state agency consultants' opinions; and (2) the difference between the ALJ's and the state agency consultants' threshold severe impairment findings did not create a conflict between the functional limitations in the RFC finding and the state agency consultants' opinions.  *Fleischer*, 774 F. Supp. at 881; *Nejat*, 359 F. App'x at 576; *Brady*, 724 F.2d at 920; SSR 96-8p, 61 Fed. Reg. at 34475.  Moreover, Woods has not pointed to, and research does not reveal, any statutes, regulations, or Sixth Circuit decisions requiring the ALJ to explain his decision to rely on a medical source in assessing a claimant's RFC, when the ALJ's and medical source did not make the same Step Two severe impairment determination.  *See generally* ECF Docs. 13 and 16.  Thus, the ALJ applied proper legal procedures in evaluating the state agency consultants' opinions.

The ALJ also applied proper legal procedures and reached a decision supported by substantial evidence in evaluating Woods' RFC.  Here, the ALJ complied with the regulations by explicitly considering all of Woods' impairments and symptoms – severe or otherwise – in light of the objective medical evidence, medical opinions, and Woods' own testimony regarding her symptoms.  20 C.F.R. §§ 404.1520(e), 404.1529(a), 416.1520(e), 416.929(a); SSR 96-8p, 61 Fed. Reg. at 34477; (Tr. 18–22).  The ALJ's finding that Woods was able to perform light work, with additional limitations to account for her impairments, was supported by substantial evidence, including: (1) treatment notes indicating that Woods symptoms were able to be controlled with medication, diuresis, a healthy diet, and exercise; (2) examination findings regularly showing that Woods had normal gait and strength; (3) Woods' reports to her treatment providers that she did not have any pain, shortness of breath, edema, fatigue, headaches, or other symptoms; and (4) the state agency consultants opinions regarding Woods' ability to lift 20 pounds occasionally, lift 10 pounds frequently, stand and/or walk for up to 6 hours in an 8-hour workday, and sit for up to 6 hours in an 8-hour workday.  (Tr. 60–62, 81–83, 277–79, 288–90, 292, 296–299, 306–13, 326, 329, 332–41, 358, 379–84, 421, 503–14, 517–18, 545, 547). Furthermore, Woods has not alleged, much less pointed to any evidence showing, that her chronic kidney disease and cardiorenal failure caused any functional limitations beyond those included in the ALJ's RFC determination.  *See generally* ECF Docs. 13 and 16; *see also* 20 C.F.R. §§ 404.1512(a), 416.912(a) (stating that the claimant has the burden to produce evidence to prove she is disabled).  Thus, the ALJ's RFC determination was reasonably drawn from the record, and the ALJ built an accurate and logical bridge between the evidence and the result. *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.2d at 545; *Fleischer*, 774 F. Supp. 2d at 877.

Because the ALJ applied proper legal procedures and reached a decision supported by substantial evidence in evaluating the state agency consultants' medical opinions and Woods' RFC, I recommend that the ALJ's decision be affirmed.

### C.  Treating Source Opinion

#### 1.  Parties' Arguments

Woods argues that the ALJ failed to provide good reasons for rejecting Dr. Bryant's opinion.  ECF Doc. 13 at 9–12.  Specifically, Woods asserts that the ALJ's explanation – that Dr. Bryant's opinion was unexplained and inconsistent with other medical evidence – was "terse," "conclusory," and "cherry-picked select treatment notes in an attempt to discredit Dr. Bryant's opinion[]."  *Id.* at 9–10.  Woods contends that the ALJ's reliance on notes indicating that Woods was "doing well" misrepresented the record as a whole, which indicated that Woods had several health problems.  *Id.* at 10–11.  Further, Woods asserts that her medical records would not have shown the full extent of limitations reflected in Dr. Bryant's opinions, because treatment notes are not prepared for Social Security review, and her symptoms were exacerbated by activity, not doctors' office visits.  *Id.* at 11.  Woods argues that Dr. Bryant was not required to include all the evidence supporting his opinion within the four corners of his opinion, and that evidence in the record was consistent with and supported Dr. Bryant's opinion. *Id.* at 10–12.

The Commissioner responds that the ALJ gave good reasons for giving little weight to Dr. Bryant's opinion.  ECF Doc. 15 at 12–13.  Specifically, the Commissioner asserts that the ALJ adequately explained that Dr. Bryant's opinion was conclusory, did not evaluate Woods' functional capacity, did provide specific information about her abilities or limitations, and was inconsistent with the record, including Dr. Bryant's own treatment notes.  *Id.* at 13.  Further, the Commissioner argues that the ALJ cited substantial evidence supporting his decision to give

Dr. Bryant's opinion little weight, including "no less than twelve independent treatment records." *Id.* at 12.  Finally, the Commissioner contends that Woods "misrepresents [her] treatment records" by stating that they do not reflect the full extent of her impairments, because her "treatment records also reflect [her] own description of her condition and functional abilities." *Id.* at 12.

Woods replies that the Commissioner's response "ignore[d] the actual issue at hand" by citing evidence supporting the ALJ's decision.  ECF Doc. 16 at 3.  She reiterates that her treatment records "may not always reveal the true nature of her debilitating disease," and that medical tests and other evidence supported Dr. Bryant's opinion.  *Id.* at 3.  Woods asserts that the ALJ should not have relied on medical findings that she was "fine" or "stable" in rejecting Dr. Bryant's opinions, because such finding were "inconsistent with the specific problems that Ms. Woods suffers from."  *Id.* at 4.

### 2.    Analysis

As discussed above, ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion.  *Gayheart*, 710 F.3d at 376. "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Id.*  (quoting 20 C.F.R. § 404.1527(c)(2)).  Good reasons for rejecting a treating physician's opinion may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. §§ 404.1527(c), 416.927(c).  Inconsistency with nontreating or nonexamining physicians'

opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Nevertheless, the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned."). When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939.

Notwithstanding the requirement that an ALJ consider and weigh medical opinion evidence, the ALJ is not required to give any deference to opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d). These issues include: (1) whether a claimant has an impairment or combination of impairments that meets or medically equal an impairment in the Listing of Impairments; (2) the claimant's RFC; (3) the application of

vocational factors; and (4) whether a claimant is "disabled" or "unable to work." 20 C.F.R. §§ 404.1527(d)(1)–(2), 416.927(d)(1)–(2).

The ALJ applied proper legal procedures and reached a decision supported by substantial evidence in weighing Dr. Bryant's treating source opinion. The ALJ complied with the regulations by specifically stating that he gave Dr. Bryant's opinion "little weight." 20 C.F.R. §§ 404.1527, 416.927; *Gayheart*, 710 F.3d at 376; (Tr. 22). The ALJ adequately gave good reasons for giving little weight to Dr. Bryant's opinion by stating that he had not explained his conclusions, he had not provided any functional limitations, and his opinion was inconsistent with his own and other providers' treatment notes, which indicated that Woods was doing well without complaints. 20 C.F.R. §§ 404.1527(c), 416.927(c); (Tr. 22). Here, the ALJ did not "cherry pick" or misconstrue the evidence by relying on treatment notes indicating that Woods was doing well; but complied with the regulations requiring him to consider the objective medical evidence and other evidence in weighing the medical opinions and evaluating Woods' RFC. *Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2);(Tr. 22). Further, the ALJ was not required to defer to Dr. Bryant's opinion, because it did not provide any functional limitations, but only opined on an issue reserved to the Commissioner – whether Woods could perform sedentary, light, or medium work as defined under the regulations. 20 C.F.R. §§ 404.1527(d), 416.927(d); (Tr. 549). Substantial evidence also supported the ALJ's decision to give Dr. Bryant's opinion little weight, including: (1) Dr. Bryant's and other providers' treatment notes, regularly indicating that Woods did well and controlled her medical problems through medications, diuresis, a healthy diet, and exercise; (2) examination findings regularly showing that Woods had normal gait and strength; and (3) Woods' reports to her treatment providers that she did not have any pain, shortness of breath, edema, fatigue, headaches, or other symptoms. (Tr. 277–79, 288–90, 292, 296–299, 306–13, 326, 329, 332–41,

358, 379–84, 421, 503–14, 517–18, 545, 547).  Thus, even if evidence could support a different result, the ALJ's weight determination fell within the Commissioner's "zone of choice" because it was reasonably drawn from the record.  *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.3d at 545.

## VI.   Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Woods' applications for DIB and SSI be AFFIRMED.

Dated: March 22, 2019

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).